**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division**

UNITED STATES OF AMERICA,      )
                                     )
             **v.**                    )        **Case No. 1:05cr294**
                                     )
MOHAN OTHNIEL GREENWOOD      )

## MEMORANDUM OPINION

Defendant Mohan Othniel Greenwood was arrested on June 17, 2005 after more than 1,800 pounds of marijuana was discovered in a search of the "Mayflower" tractor-trailer he was driving in Northern Virginia. Greenwood was charged with one count of conspiracy to distribute 1000 kilograms or more of marijuana, in violation of 21 U.S.C. §§ 846 and 841, and one count of possession with intent to distribute 100 kilograms or more of marijuana, in violation of 21 U.S.C. § 841(a)(1). By pretrial motion, defendant seeks to suppress the drugs discovered on the moving truck on the ground that the search violated the Fourth Amendment. An evidentiary hearing was held on November 17, 2005, at which the government presented the testimony of Detective D.C. DeCoster, a member of the Fairfax County Organized Crime and Narcotics Section, and Detective D.J. Kline, a member of the Fairfax County K-9 unit. At the conclusion of the evidentiary hearing, the motion was denied for the facts and reasons stated from the bench, which are elucidated below.

**I.[1]**

The record reflects that members of the Fairfax County police force had received credible information from the Federal Bureau of Investigation (FBI) that a large shipment of controlled

---

[1] The facts recited here are the Court's findings of fact pursuant to Rule 12(d), Fed. R. Crim. P.

substances would be transported in a Mayflower tractor-trailer on or about June 17, 2005 to New York via Fairfax County, Virginia.  Armed with this information, Detective DeCoster, a ten year veteran of the police force with considerable experience in enforcing the Virginia traffic laws, along with his partner, Detective Sylmar, waited for and eventually spotted the Mayflower tractor-trailer on Interstate 95 near its intersection with Route 123 in this district.  It is not disputed that DeCoster's mission was (i) to intercept the tractor-trailer as it made its way north on Interstate 95, (ii) to make a stop if the tractor-trailer violated any of the traffic laws, and (iii) to request consent to search the trailer if the opportunity presented itself.  After following the tractor-trailer for two to three miles in heavy traffic, Officer DeCoster maneuvered his vehicle to the front of the tractor-trailer, and noticed that the top of the front license plate was bent over such that the issuing state was illegible. He also noticed that the bottom corners of the license plate were bent such that he could not see whether expiration stickers were present.[2]  While DeCoster believed the tractor's license plate was likely not a Virginia license plate, he was not certain, and the condition of the license plate prevented him from "running the tags" on his  cruiser's computer.  Based on these facts, DeCoster determined that the license plate was obscured in such a way as to be in violation of Va. Code 46.2-716.[3]

───────────────

[2] The government submitted photographic evidence, specifically Government's Exhibit 1, which confirms DeCoster's testimony in this regard.

[3] Va. Code 46.2-716 provides, in pertinent part, as follows:

A. Every license plate shall be securely fastened to the motor vehicle, trailer, or semitrailer to which it is assigned:

   1. So as to prevent the plate from swinging,

   2. In a position to be clearly visible, and

   3. In a condition to be clearly legible.

After observing the traffic violation, DeCoster maneuvered to a position behind the tractor-trailer and activated his lights and siren to alert the driver of the tractor-trailer to pull over.  In response, the tractor-trailer pulled over to the shoulder of the road near the intersection of Route 1 and Interstate 95.  DeCoster exited his cruiser and approached the tractor-trailer's driver's side door.  The driver, identified as defendant Greenwood, stepped from the cab and DeCoster requested his license, registration, proof of insurance, bill of lading and log book.  After supplying these items, DeCoster and Greenwood stepped to the grassy side of the shoulder, where DeCoster questioned Greenwood about the particulars of his shipment, including whether there was anything about the contents of the tractor-trailer DeCoster should know.  Greenwood, appearing more nervous, replied that there was nothing, and offering DeCoster the keys, asked whether he would like to check the trailer himself.  DeCoster declined the offer at this time, and returned to his police cruiser while Greenwood remained on the shoulder with DeCoster's partner, Detective Sylmar.  In the police cruiser, DeCoster ran the license and registration, checked in with the dispatcher, checked the log book for accuracy, checked to make sure the driver and the vehicle were insured, and checked the bill of lading to determine what materials Greenwood was transporting.  He eventually wrote out a warning ticket for the obscured license plate, as well as for the fact that the tractor-trailer's logbook was not properly updated.

At this point, DeCoster exited his cruiser and explained to Greenwood that he was receiving a warning that would not result in any fine or points on Greenwood's license.  He then informed Greenwood that he was free to go and stepped away from Greenwood.  Greenwood began walking back to the cab of the tractor-trailer when DeCoster called after him, saying "Sir, if you have a minute, I would like to take you up on looking through your truck."  Greenwood turned and

approached the rear of the trailer with his keys in his hand, and said something to the effect of "Ok,

you wanna check it." DeCoster told Greenwood that he would perform the search himself and that

Greenwood should wait by the side of the road with Detective Sylmar. DeCoster asked Greenwood

once again whether he would consent to DeCoster's inspection of the vehicle, including the trailer,

and Greenwood again agreed and handed him the keys.

At that moment, Detective D.J. Kline, of the Fairfax County K-9 Unit, who had recently

arrived at the scene with his K-9 dog, "Stuart," approached the tractor-trailer.[4] Greenwood

consented to DeCoster's request to allow the dog into the tractor's cab, in order to "speed things up,"

and Detective Kline and Stuart proceeded to the front of the tractor to search the cab. Detective

Kline took Stuart along the driver's side of the tractor-trailer and into the cab of the trailer. After

exiting the cab, Stuart proceeded from the driver's side door of the cab towards the rear of the trailer.

At this point, Stuart "alerted"[5] to the presence of narcotics, and proceeded to seek the source of the

odor of narcotics which Stuart then indicated was the rear door of the trailer.

After Stuart alerted, DeCoster opened the door at the rear of the trailer and, within seconds,

---

[4] Both Kline and Stuart had received extensive training in drug detection. Kline and Stuart were certified as a K-9 narcotics detection team by U.S. Customs and Border Protection in 2003, and have been recertified every year since. Detective Kline testified that he and Stuart have performed roughly 1,500 searches or scans per year over the past two years with an accuracy rate of approximately 95%.

[5] In his testimony, Kline described Stuart's "alert" as follows:

[H]e gives a head turn, which is going down, he just pretty much snaps his neck back. His interest is very much more. His breathing becomes a lot more heavy. He is sucking in and out with his nose, sniffing. His tail goes up and starts wagging a lot more than usual. That's what his alert is.

November 17, 2005 Transcript, at p. 118, lines 9-16.

DeCoster smelled marijuana. Kline then took Stuart into the trailer and Kline also smelled marijuana. Stuart attempted to jump up a large stack of boxes to locate the source of the odor. One of these boxes was pulled down, and Stuart began scratching the box. The box, which was taped and glued shut, was eventually opened to reveal what appeared to be a bale of marijuana wrapped in several layers of cellophane. At this point, Greenwood was placed under arrest.

DeCoster estimated that the period between the traffic stop and when Greenwood was issued the warning ticket was approximately fifteen minutes, and that the period of time between the warning ticket and the discovery of marijuana did not exceed ten minutes.

## II.

### A. The Traffic Stop

Because a "[t]emporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a 'seizure' of 'persons'" under the Fourth Amendment, automobile stops require an objectively reasonable basis. *Whren v. United States*, 517 U.S. 806, 809 (1996). And in this respect, it is settled that probable cause to believe that a traffic violation has occurred constitutes an objectively reasonable basis for a stop. *Id.* at 810. Nor does it matter that an officer may be using the traffic violation as a pretext to investigate a suspected, more serious offense; it is well-settled that if the stop of a suspect's vehicle is objectively reasonable, then it is constitutionally permissible even if the stop is pretextual.[6] As the Supreme Court has explained, "an individual officer's subjective intentions are irrelevant to the

---

[6] *See Whren v. United States*, 517 U.S. 806, 813 (1996) ("Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis."); *United States v. Bullock*, 94 F.3d 896, 899 (4th Cir. 1996); *United States v. McDonald*, 61 F.3d 248, 254 (4th Cir. 1995); *United States v. Hassan El*, 5 F.3d 726, 730 (4th Cir. 1993).

Fourth Amendment validity of a traffic stop that is justified objectively by probable cause to believe

that a traffic violation has occurred."  *City of Indianapolis v. Edmond*,  531 U.S. 32, 45 (2000).

Thus, Detective DeCoster's stop of Greenwood does not violate the Fourth Amendment so long as

DeCoster had an objectively reasonable basis for the stop.

DeCoster testified that after following Greenwood for several miles he pulled in front of the

tractor-trailer and noticed that the front license plate was bent such that DeCoster could not read the

issuing state of the license plate.  Given this, DeCoster concluded that the condition of the license

plate violated Va. Code 46.2-716, which provides, in pertinent part, that "[e]very license plate shall

be securely fastened to the motor vehicle, trailer, or semitrailer to which it is assigned  .  .  .  [i]n a

condition to be clearly legible." Va. Code 46.2-716.  Accordingly, DeCoster pulled Greenwood over.

The defendant attacks the stop on two grounds: First, he argues that the license plate was not

in fact obscured, and that DeCoster therefore lacked any reasonable basis for pulling over the tractor-

trailer.  Second, he argues that Va. Code 46.2-716 violates the U.S. Constitution's prohibition against

state regulations that burden interstate commerce,[7] and that because the underlying statute is

unconstitutional, it cannot serve as the basis of DeCoster's stop.

In response to defendant's first argument, the government presented the testimony of

DeCoster, who testified under oath that he could not read the issuing state at the top of the license

plate.  DeCoster's testimony was credible in establishing that the condition of the license plate

violated Va. Code 46.2-716, but it need not carry this burden alone, as the government also provided

---

[7] *See e.g., American Trucking Associations, Inc. v. Michigan Public Service Comm'n,* 125
S.Ct. 2419, 2423 (U.S. 2005) (explaining that the negative commerce clause "prevents a State
from 'jeopardizing the welfare of the Nation as a whole' by 'plac[ing] burdens on the flow of
commerce across its borders that commerce wholly within those borders would not bear.'")
(quoting *Oklahoma Tax Comm'n v. Jefferson Lines, Inc.*, 514 U.S. 175, 180 (1995)).

photographic evidence of the condition of the license plate.  Government's Exhibit 1 is a photograph of the front of the tractor on the date in question and shows that the top of the license plate had been bent such that the name of the issuing state was illegible.  Significantly, the statute does not restrict its operation solely to Virginia license plates, but requires that "every license plate" be "clearly legible."  Va. Code 46.2-716.[8]  Thus, the condition of the license plate provided DeCoster with an objectively reasonable basis for the traffic stop, and the fact that the traffic stop was a pretext for further investigation is irrelevant and does nothing to impair the stop's constitutionality.  *Whren*, 517 at 813.

Similarly unpersuasive is defendant's second argument, that Va. Code 46.2-716 violates the negative commerce clause, and therefore cannot serve as the basis for a traffic stop.  In support, defendant cites *Philadelphia v. New Jersey*, 437 U.S. 617, 627 (1978) (holding that a New Jersey statute prohibiting the importation of waste materials into the state violated the negative commerce clause), and the more recent case of *Granholm v. Heald*, 125 S.Ct. 1885, 1895 (2005) ("States may not enact laws that burden out-of-state producers or shippers simply to give a competitive advantage to in-state businesses.").  Based on these decisions, he argues that Va. Code 46.2-716 violates the Constitutional prohibition of state laws that discriminate against out of state commerce.

The merits of defendant's negative commerce clause argument are doubtful, given that the Virginia statute, as applied to all vehicles traveling in Virginia, is both reasonable and neither discriminates against interstate commerce, nor results in an unreasonable burden on such commerce.  *See American Trucking Associations, Inc. v. Michigan Public Service Com'n*, 125 S.Ct. 2419, 2423

---

[8] Because the statute is not restricted to Virginia license plates, knowledge that the tractor was registered in Missouri that could theoretically be imputed to DeCoster does not affect the conclusion that DeCoster had a reasonable basis for the traffic stop.

(2005) (holding that Michigan's imposition of flat $100 annual fee on trucks engaging in intrastate commercial hauling was valid exercise of state's police power, which did not violate dormant Commerce Clause).   In any event, it is unnecessary to reach the merits of defendant's negative commerce clause argument inasmuch as the Fourth Amendment requires only that DeCoster have an objectively reasonable basis for the stop, not that he correctly discern the constitutionality of the traffic statute on which he relies.   In other words, it is enough that DeCoster or any officer enforce a statute as written; he is not tasked with making constitutional judgments, with which even the Supreme Court sometimes struggles.   *See, e.g., American Trucking*, 125 S.Ct. at 2426 (Thomas, J., concurring in the judgment) ("The negative Commerce Clause has no basis in the text of the Constitution, makes little sense, and has proved virtually unworkable in application, and, consequently, cannot serve as a basis for striking down a state statute.") (internal citations and quotations omitted).

Section 46.2-716 has been a part of the Virginia Code since at least 1989, and there is no reason for DeCoster to have doubted that it was a legitimate and constitutional basis for a traffic stop.   As long as a state statute is on the books, it may serve as the basis for a police stop if the officer has an objectively reasonable basis for believing it has been violated.   As explained above, DeCoster's testimony as well as the photographic evidence, confirms that such a basis existed, and therefore Greenwood's argument that the stop violated his Fourth Amendment rights fails.

**A. Greenwood's Consent to the Search**

It is well-settled that unless an exception applies, the Fourth Amendment requires law enforcement officials to obtain a warrant before they conduct a search.   *See United States v. Boone*, 245 F.3d 352, 361 (4th Cir. 2001) (citing U.S. Const. amend. IV).   It is equally well-settled that one

such exception is the voluntary consent to a search. *See, e.g., Schneckloth v. Bustamante*, 412 U.S. 218, 219 (1973) ("One of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent.").  Consent to a warrantless search is not voluntary, however, if "it is the product of official intimidation or harassment." *Florida v. Bostick*, 501 U.S. 429, 438 (1991).  Defendant here argues that the circumstances of his consent demonstrate that it was not voluntarily because, though Detective DeCoster told Greenwood he was free to go prior to obtaining his consent to search the trailer, "a reasonable person, under the circumstances, would [not] have considered that he was free to disregard [DeCoster] and simply drive away." *Reittinger v. Commonwealth*, 260 Va. 232, 237, 532 S.E.2d 25, 28 (2000).

The test for determining whether consent was voluntarily given is  "whether, under the totality of the circumstances surrounding the encounter, a reasonable person in the suspect's position 'would have felt free to decline the officers' requests or otherwise terminate the encounter.'" *United States v. Sullivan*, 138 F.3d 126, 132 (4th Cir. 1998) (quoting *Florida v. Bostick*, 501 U.S. 429, 438 (1991)); *see also United States v. Weaver*, 282 F.3d 302, 309 (4th Cir. 2002), *cert. denied*, 537 U.S. 847 (2002) ("Circumstances where the citizen would feel free to go, but stays and has a dialogue with the officer, are considered consensual, and therefore do not implicate the Fourth Amendment."). Here, consideration of all the circumstances surrounding the consent demonstrate that it was, in fact, voluntary.  The stop occurred in the middle of a sunny day along the side of a busy highway. Although, DeCoster was wearing a weapon, he never removed it from its holster, nor did he speak to Greenwood in a threatening or aggressive matter.  DeCoster had given Greenwood a warning ticket for the illegible license plate and the inadequately updated log book and had told him he was

free to leave.  At this point, the stop had ended.  As Greenwood was walking away, DeCoster asked, in a calm voice, whether he could take Greenwood up on his earlier offer to search the trailer. Greenwood agreed and began walking to the door to open it, whereupon DeCoster indicated to Greenwood that he, DeCoster, would open the door.  Before DeCoster did so, however, he confirmed Greenwood's consent to search the trailer and also received Greenwood's consent to allow the dog to search.

Such facts stand in sharp contrast to those presented to the Supreme Court of Virginia in *Reittinger v. Commonwealth*, 260 Va. 232, 532 S.E.2d 25 (2000), the case on which defendant relies. There, the defendant was stopped in a rural area at night.  Officers flanked either side of the automobile, and when Reittinger did not respond to the officer's first request to search the vehicle, the officer asked for such consent repeatedly, despite the fact that the officer admitted he "had no reasonable and articulate suspicion of criminal activity on the part of Reittinger." *Reittinger*, 260 Va. at 237, 532 S.E.2d at 28-29.  The *Reittinger* decision embodies no new legal principles, but simply applies the settled principles (that also apply here) to a different set of facts.  Because the facts in *Reittinger* are sharply distinguishable from those presented here, that decision does not alter the conclusion that Greenwood's consent to the search of the trailer was voluntarily given.

Nor is the defendant's argument based on the Fourth Circuit's decision in *United States v. Gooding*, 695 F.2d 78 (4th Cir. 1982), any more persuasive.  *Gooding* concerned the legality of a *Terry* stop, wherein the Fourth Circuit found that the officers did not have a "reasonable articulable suspicion" for their initial stop of the defendant, and that this tainted the defendant's subsequent consent.  *Id.* at 84.  The stop in the case at bar, unlike the stop in *Gooding*, was based on the violation of a traffic law, namely defendant's violation of Va. Code 46.2-716, and therefore *Gooding*

is factually inapposite.

**III.**

In sum, Officer DeCoster's traffic stop of the defendant had an objectively reasonable basis, and therefore could not taint Greenwood's subsequent consent.  Furthermore, Greenwood's consent was given after the traffic stop had ended under circumstances that do not evidence any coercion or intimidation, and was therefore voluntary.  For these reason, the search of the trailer did not violate Greenwood's Fourth Amendment rights, and the motion to suppress is appropriately denied.


                                                          ___/s/_____
Alexandria, Virginia                                      T. S. Ellis, III
December 14, 2005                                         United States District Judge